UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JEROME EMMANUEL DAVIS,                    Case No. 13-CV-2449 (DSD/JJK)

             Petitioner,

v.                                        REPORT AND RECOMMENDATION

WARDEN K. GRANDLIENARD,

             Respondent.

---

Jerome Emmanuel Davis, pro se.

Jean E. Burdof, HENNEPIN COUNTY ATTORNEY'S OFFICE; Matthew Frank and James B. Early, MINNESOTA ATTORNEY GENERAL'S OFFICE, for respondent.

Petitioner Jerome Emmanuel Davis, a Minnesota state prisoner, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his conviction for first-degree felony murder. The petition has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Based on that review, this Court recommends that Davis's habeas petition be denied and this action be dismissed with prejudice.

## I.  BACKGROUND

The events at issue in Davis's criminal case were described by the Minnesota Supreme Court as follows:

> Armando Calix bled to death on the lawn outside of his apartment shortly after being shot in the neck at about 8:00 p.m. on May 11, 2007. The investigation of Calix's death led the police to believe that either Davis or his accomplice, Toriano Dorman, killed Calix while committing an aggravated robbery. After a jury trial in which the following facts were established, Davis was convicted of aiding and abetting first-degree felony murder. . . .

The day before the murder, May 10, 2007, Davis made inculpatory statements during a telephone conversation with his friend, Anthony Whigham. The conversation was recorded because Whigham was an inmate at the Hennepin County Jail. During the phone call, Whigham asked, "What is going down with you," to which Davis responded, "Fucked [up,] about to rob somebody." When Whigham asked if he was serious, Davis replied, "Hell yeah." Davis then told Whigham that he had purchased a "bubble" because his old car had been stolen. Later, Whigham implied that he wanted Davis to give him money to hire a lawyer. Davis responded that he did not currently have any money but that a white woman was trying to line up a $10,000 "lick" for him. Davis told Whigham that if the lick went well, he would give Whigham $1,500 for a lawyer. Immediately after the discussion of the planned robbery, Davis asked Whigham for Jovan Gentle's telephone number.

Jovan Gentle contacted Davis during the afternoon of May 11, 2007. Gentle wanted to meet and talk to Davis about getting back Gentle's watch — a watch that Davis had sold to another friend. Davis agreed to meet, and they met at or near 36th Street and Portland Avenue in south Minneapolis. Gentle came to the meeting in his car, and Davis arrived in a "four-door, blue Caprice," or "bubble." According to Gentle, Davis had two passengers: a person he identified as "Fifty," and Toriano Dorman. As soon as Davis and Gentle arrived, they got out of their cars and started arguing about the watch. During the argument, Dorman got out of Davis's car "clenching" a revolver in an apparent attempt to defend Davis, but Davis ordered Dorman back inside the car. After the argument, Davis and Gentle got back in their cars and drove toward 31st Street. Gentle then drove home.

Sometime later, Gentle received a telephone call from Davis. Davis asked Gentle to meet him on 31st Street and Pleasant Avenue to help with a robbery. While Gentle initially told Davis that he would help, he later changed his mind and stayed at home.

Cell phone records showed that Dorman and Davis, and Dorman and Calix, were in contact with each other on the day of Calix's murder. The police discovered that Calix had made and received numerous calls to and from a phone associated with Dorman throughout the day of the shooting. The last call to Calix from Dorman's phone was made at 8:01 p.m., and was routed

through a cell tower a few blocks from the crime scene.  Phone records also revealed that there were seven calls between Dorman's cell phone and one of Davis's cell phones earlier in the day.

In addition to the cell phone record evidence, the State also introduced testimony from B.B., who placed Davis and Dorman at the crime scene just minutes before Calix's death.  Shortly before 8:00 p.m., B.B. noticed Davis and Dorman walking across the yard of 3043 Grand Avenue South.  B.B. recognized them because he had seen them on many occasions.  According to B.B., Davis and Dorman hesitated in the yard momentarily, and then went through a hole in a fence to the apartment building next door, 3044 Pleasant Avenue (Calix's apartment building).  While they were going through the fence, B.B. saw Davis holding something on his side to stop it from catching on the hole in the fence.  Davis and Dorman then entered Calix's apartment building.  Just after Davis and Dorman entered the apartment, B.B. got into his car to leave, but due to traffic congestion, he was unable to leave.  About 3 minutes after he got into his car, B.B. heard a gunshot and called 911. . . .

Minneapolis police officers Steven Manhood and Jeffrey Egge responded to the crime scene less than 2 minutes after B.B. called 911.  The officers found Calix lying in a pool of blood in front of the 3044 Pleasant Avenue apartment building.  Officer Manhood checked Calix for a pulse but did not find one.  When other officers arrived, Manhood and Egge followed a trail of blood into Apartment 2 of the 3044 Pleasant Avenue building.  After checking the apartment for other victims, suspects, and weapons, police sealed the apartment until a search warrant could be obtained.

After obtaining a warrant, the police searched Apartment 2.  They found a bullet hole in a window and bullet fragments near the window.  They also found a knife on the ground with Calix's blood on it.  The police swabbed the door knobs from the main door to the apartment and an interior closet door for DNA and fingerprints, but these swabs did not render meaningful results.

The medical examiner pronounced Calix dead at the scene.  Later, an autopsy revealed that Calix died from one gunshot wound to the neck.

*State v. Davis*, 820 N.W.2d 525, 528-29 (Minn. 2012) (footnotes omitted).

On April 30, 2009, Davis was indicted in Hennepin County, Minnesota on one count of aiding and abetting first-degree felony murder in violation of Minn. Stat. § 609.185(a)(3).  *Id.* at 532.  A jury found Davis guilty of that offense, and the trial court sentenced Davis to a life term of imprisonment.  *Id.* at 533.

Davis appealed his conviction directly to the Minnesota Supreme Court.  On appeal, Davis's counsel raised five grounds for relief, arguing that (1) statements made by Davis to the police during an interrogation one week after the murder should have been suppressed as solicited as involuntary, *see Miranda v. Arizona*, 384 U.S. 436 (1966); (2) the district court improperly excluded two hearsay statements that would have proven helpful to Davis's defense; (3) the district court erred when it allowed Gentle to speak at trial about his fearfulness from testifying; (4) the district court erred when it instructed the jury that no adverse inference should be drawn from Davis's failure to testify at trial, despite Davis not requesting such an instruction; and (5) even if any of these errors individually did not entitle Davis to relief, the cumulative effect of the errors required that Davis be given a new trial.  *See Davis*, 820 N.W.2d at 533.  Davis, acting pro se, also raised "dozens" of other issues in two supplemental briefs filed with the Minnesota Supreme Court.  *Id.* at 539.  The Minnesota Supreme Court found that none of the grounds for relief raised by Davis, either through his counsel or in his supplemental briefs, entitled him to a new trial, and it therefore affirmed Davis's conviction.  *Id.* at 533-40.

Following his appeal to the Minnesota Supreme Court, Davis filed a petition for a writ of habeas corpus in this District pursuant to § 2254.  *See* Petition [ECF No. 1]; Pet. Addendum

[ECF No. 1-1].  Davis raises fifteen separate grounds for relief in his habeas petition and accompanying documents:

- In Ground One, Davis argues that the deportation of two potential witnesses deprived him of evidence favorable to his defense and thereby violated his Sixth Amendment right to compulsory process for obtaining favorable witnesses.  *See* Petition at 5.

- In Ground Two, Davis argues that the prosecutor knowingly allowed Gentle to offer false testimony, both during the grand-jury proceedings and at trial.  *See id*. at 7.

- In Ground Three, Davis argues that statements he made to police during an interrogation after the murder were improperly introduced at trial in violation of *Miranda*.  *See id*. at 8.

- In Ground Four, Davis argues that the trial court erred by instructing the jury not to draw any adverse inference from Davis's decision not to testify, despite Davis not requesting such an instruction.  *See id*. at 10.

- In Ground Five, Davis argues that certain hearsay statements favorable to his defense should not have been excluded from evidence at trial.  *See* Pet. Addendum at 1.

- In Ground Six, Davis argues that the trial court erred in allowing Gentle to testify that he was fearful of what might happen to him as a result of testifying at Davis's trial.  *See id*. at 2.

- In Ground Seven, Davis argues that the jury's finding that he was guilty of first-degree felony murder is logically inconsistent with Dorman's guilty plea to second-degree murder with respect to Calix's death. *See id.* at 3-4.

- In Ground Eight, Davis argues that the prosecution failed to disclose evidence favorable to his defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972). *See* Pet. Addendum at 5.

- In Ground Nine, Davis argues that the evidence introduced at his trial was insufficient to sustain a guilty verdict. *See id.* at 6.

- In Ground Ten, Davis argues that his conviction was in violation of a provision of Minnesota law which provides that a criminal conviction cannot be based on the uncorroborated testimony of an accomplice. *See id.* at 7-8. He also argues that this violation of Minnesota law resulted in a parallel deprivation of his federal constitutional due-process rights. *Id.*

- In Ground Eleven, Davis argues that his defense counsel failed to provide effective assistance in several respects. *See id.* at 9.

- In Ground Twelve, Davis argues that the prosecutor made "inappropriate and prejudicial statements and also misstated evidence and made up evidence of testimony" during closing arguments. *Id.* at 10.

- In Ground Thirteen, Davis argues that the prosecution struck a prospective juror on the basis of that person's race (or perhaps age) in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). *See* Pet. Addendum at 12.

- In Ground Fourteen, Davis argues that the trial court erred by allowing the jury to listen to prejudicial audio recordings admitted into evidence during their deliberations. *See id.* at 13.

- Finally, in Ground Fifteen, Davis argues that the cumulative effect of these alleged errors requires reversal of his conviction, even if no individual error requires reversal on its own. *See id.* at 14.

Respondent originally moved to dismiss the habeas petition on the basis that some of the claims raised by Davis had not been exhausted in the state courts  *See* ECF No. 5; *Rose v. Lundy*, 455 U.S. 509, 522 (1982) (finding that mixed petitions raising both exhausted and unexhausted claims should be dismissed for failure to exhaust state remedies).  This Court agreed with respondent that Davis's habeas petition raised both exhausted and unexhausted claims.  *See* ECF No. 16.  But rather than dismissing the habeas petition, this Court permitted Davis to withdraw the unexhausted claims and proceed with the claims that had been adequately raised before the Minnesota Supreme Court.  *Id.*

Davis elected to withdraw Ground Nine (sufficiency of the evidence) and Ground Fourteen (the trial court's decision to allow jurors to listen during deliberations to audio recordings admitted to evidence) of his habeas petition, thus leaving thirteen grounds for relief pending.  *See* ECF No. 17.  Respondent then moved once again to dismiss the habeas petition, arguing that one of the remaining thirteen claims was unexhausted and thus that the petition continued to be a mixed petition.  *See* ECF No. 23.  This Court denied respondent's second motion to dismiss and ordered respondent to file an answer to the habeas petition.  *See* ECF

No. 28.  Respondent has filed this answer, and Davis has filed a reply to the answer.  This matter is now fully briefed and ready for consideration by this Court.

## II.  ANALYSIS

### A.  *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes the standards that govern this Court's substantive review of Davis's current habeas corpus claim. The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed this provision and how it should be applied by the federal district courts.  The Supreme Court recognized that

> a state-court decision can be "contrary to" this Court's clearly established precedent in two ways.  First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Id*. at 405.  Under the "unreasonable application" clause, "a federal habeas court may grant the

writ if the state court identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.

The Supreme Court also explained that

> A federal habeas court making the "unreasonable application"
> inquiry should ask whether the state court's application of clearly
> established federal law was objectively unreasonable. . . .  [A]
> federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant state-
> court decision applied clearly established federal law erroneously
> or incorrectly.  Rather, that application must also be unreasonable.

*Id*. at 409, 411.

A writ of habeas corpus may also be available where the state courts' resolution of a

prisoner's criminal case is "based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other words,

habeas relief can be granted if the conviction is based on findings of fact that could not

reasonably be derived from the state court evidentiary record.  When reviewing a state court

decision, however, "a federal court . . . presumes that the state court's factual determinations are

correct," and that "presumption may be rebutted only by clear and convincing evidence."  *Lee v.*

*Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).  In addition, 28 U.S.C. § 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct.  The applicant shall have the burden of
> rebutting the presumption of correctness by clear and convincing
> evidence.

Needless to say, a federal district court is not allowed to conduct its own de novo review

of a prisoner's constitutional claims.  *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We

cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."). "AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and quotations omitted). Habeas relief cannot be granted unless the petitioner has identified and substantiated a specific error committed by the state courts. Moreover, the petitioner must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in *Williams*. The petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

### B.  Claims for Relief

#### 1.  Ground One

Davis first contends that two potential defense witnesses — Plinio Portillo Cruz and Norman Mejia Arita — were deported prior to trial, thereby depriving Davis of his ability to call those individuals to testify on his behalf. According to Davis, Cruz and Arita "could have cleared me of this crime by telling the courts that there wasn't a robbery, and that I didn't shoot Mr. Calix." Petition at 5. Davis argues that the loss of this "material and favorable" evidence prejudiced him at trial, *id.*, and that his constitutional right to compulsory process for obtaining favorable witnesses was violated as a result.[1]

_____

[1]Davis also argues that the deportation of Cruz and Arita violated his constitutional right to due process. He does not contend, however, that the analysis for this claim under the due-

(continued...)

-10-

"[T]he Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor*.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (quoting U.S. Const. amend. VI).  The United States Supreme Court has found a violation of the Sixth Amendment's compulsory-process clause results only "when the defendant was arbitrarily deprived of 'testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense." *Id*. (quoting *Washington v. Texas*, 388 U.S. 14, 16 (1967)).  "This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of [potential witnesses] deprived him of their testimony.  He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Id*.

The Minnesota Supreme Court found, in a summary fashion, that Davis's compulsory-process claim "lack[ed] merit."  *Davis*, 820 N.W.2d at 539.  This Court concludes that the Minnesota Supreme Court's decision was neither (1) "contrary to, or involved an unreasonable application of, clearly established Federal law" nor (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999) ("The summary nature of the [state-court] opinion does not affect this standard of review.").  Simply put, Davis has not

---

[1](...continued)
process clause is different in any way from the analysis under the compulsory-process clause. *See also United States v. De La Cruz Suarez*, 601 F.3d 1202, 1212-13 (11th Cir. 2010) (analyzing compulsory-process challenge and parallel due-process challenge as equivalent). This Court therefore considers both aspects of Davis's claim under the framework set forth in *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

pointed to evidence showing that Cruz or Arita would have provided material and favorable testimony on his behalf.  Although Davis speculates that the two men would have testified that "there wasn't a robbery, and that I didn't shoot Mr. Calix," App'x at 1483,[2] Davis cannot point to any specific basis for believing that Cruz or Arita would have offered such testimony at trial. For example, neither of the statements offered by Cruz and Arita to the police exculpated Davis in any way.  *See* Pet. Exs. 18, 28 [ECF No. 14].  In fact, those statements tended to *inculpate* Davis insofar as Cruz and Arita placed an individual with Davis's physical features at the scene of the crime.  *See id.*  Likewise, nothing else cited by Davis from the record shows that Cruz or Arita would have "cleared [him] of this crime by telling the courts that there was not a robbery" or that he did not shoot Calix.  *See* Pet. Reply No. 2 at 6 [ECF No. 38-1].[3]  Davis's assertions to the contrary are nothing more than speculation.

Without specific evidence from the record demonstrating — or at the very least *suggesting* — that Cruz or Arita would have provided testimony material and favorable to his defense, Davis cannot show that the Minnesota Supreme Court's decision as to his compulsory-process claim was erroneous.  Accordingly, this Court recommends that Ground One of Davis's habeas petition be denied.

_____

[2]The appendix is consecutively paginated across eight ECF entries.  ECF No. 32 contains pages 1-389; ECF No. 32-1 contains pages 390-596; ECF No. 32-2 contains pages 597-879; ECF No. 32-3 contains pages 880-1135; ECF No. 32-4 contains pages 1136-1416; ECF No. 32-5 contains pages 1417-77; ECF No. 32-6 contains pages 1478-1613; and ECF No. 32-7 contains pages 1614-35.  Wherever this court cites to the appendix, it cites to the pagination in the bottom-right corner of the document, and not any pagination that may appear elsewhere on the document.

[3]Davis's reply brief was filed as four separate documents.  This Court will refer to the document filed in ECF No. 38 as "Pet. Reply No. 1," ECF No. 38-1 as "Pet. Reply No. 2"; ECF No. 38-2 as "Pet. Reply No. 3," and ECF No. 38-3 as "Pet. Reply No. 4."

2.  Ground Two

Gentle testified at trial that Davis was in possession of a green tub containing 15 to 20 pounds of marijuana that had been taken from Calix's home.  *See* App'x at 904-06.  This testimony helped to establish that Davis was at the scene of the murder when it occurred and that the murder had been committed in the commission of a felony (the robbery of the marijuana from Calix).  Davis argues that Gentle's testimony was false, that both Gentle and the prosecutor knew the testimony was false, and that his constitutional due-process rights were violated by the prosecutor's decision to allow Gentle to offer this false testimony.  *See* Petition at 7.  Davis also argues that Gentle offered similar false testimony before the grand jury.  As with the other pro se arguments raised by Davis, the Minnesota Supreme Court concluded tersely that this claim "lack[ed] merit."  *Davis*, 820 N.W.2d at 539.

Ground Two must fail for the simple reason that Davis has not shown Gentle's testimony to have been false.[4]  *Cf. Pederson v. Fabian*, 491 F.3d 816, 827-28 (8th Cir. 2007) (noting that due-process claim based on false testimony necessarily fails where testimony was not false).  Davis argues that certain evidence — or, more accurately, the *lack* of certain evidence — demonstrates that he was never in possession of a green tub filled with marijuana as claimed by Gentle.  For example, Davis points out that DNA and fingerprint tests conducted on the green tub turned up inconclusive, and that police were unable to recover any of the marijuana stolen

---

[4]Davis's claim with respect to the grand-jury proceedings also fails for a second, more fundamental reason.  "'[E]ven if we were to assume there was prosecutorial misconduct during the grand jury proceedings, the petit jury's guilty verdict rendered those errors harmless.'" *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005) (quoting *United States v. Sanders*, 341 F.3d 809, 818 (8th Cir. 2003)).

-13-

from Calix.  But none of this proves that Gentle was lying; forensics tests are hardly infallible,[5] and the failure of police to recover marijuana from Davis does not necessarily mean that he was never in possession of the marijuana about which Gentle testified.  Davis also points out that Gentle originally told police that the container carrying the marijuana was blue or grey, not green.  *See* Pet. Ex. 6.  But there is no reason to believe that this difference in testimony was anything but a failure of recollection rather than a purposeful falsehood.

Finally, and perhaps most importantly, even if Davis had shown that Gentle's testimony was knowingly false (and he has not), "[i]n order to be entitled to habeas corpus relief on a claim that a conviction was premised on perjured testimony, a defendant must show that the *prosecution knowingly* used perjured testimony . . . ."  *Blair v. Armontrout*, 916 F.2d 1310, 1316 (8th Cir. 1990) (emphasis added).  Nothing in Davis's habeas petition or supporting papers indicates that the prosecution knowingly offered false testimony from Gentle.  Accordingly, Ground Two should be denied.

### 3.  Ground Three

Davis was arrested one week after Calix's murder on an unrelated assault charge.  *See Davis*, 820 N.W.2d at 530.  "On the day Davis was arrested, Minneapolis Police Officer Christopher Karakostas interrogated Davis about the Calix shooting."  *Id*. at 531.  The Minnesota Supreme Court summarized the subsequent interrogation (which was recorded on video) as follows:

---

[5]In fact, the forensics expert who testified at Davis's trial was asked whether she would "be able to say . . . somebody didn't touch [the green tub], if their DNA wasn't on there?" App'x at 876.  The expert answered, "I can't say that, no."  *Id*.

After confirming Davis's identity and informing Davis that he had been arrested for an assault, Karakostas informed Davis of his *Miranda* rights. Davis indicated that he understood his rights and Karakostas then questioned Davis about the assault.

After a few minutes, Karakostas turned his attention to the Calix shooting. Karakostas asked Davis several times about the last time he had been in south Minneapolis, and Davis responded that he had not been to south Minneapolis in at least two weeks. Karakostas then asked Davis where he was on the night of May 11. Davis told Karakostas that he was in his house in Saint Paul. After Karakostas tried to nail down what Davis meant, Davis began to worry out loud that he was not being questioned solely about an assault. Karakostas then told Davis that he was arrested for the assault but that his name had "come up in something else too." Davis then asked Karakostas if he could go home after the interrogation. Karakostas replied in the negative, telling Davis that he was going to jail after the interview for the assault and that he was "getting [himself] kind of jammed up on something" else, as well.

After hearing this, Davis got visibly agitated and said, "[o]kay can ya'll just send me. I don't know about nothing that's going on. You talking to me, you won't tell me nothing's going on. I don't know, can you just send me to jail then 'cause I don't know." Karakostas then attempted to clarify what Davis meant by "I don't know," and Davis responded that he did not know anything about the assault. Davis then repeated that he wanted to go to jail for the assault.

After Karakostas again asked Davis where he was on May 11, Davis stated, "I just told you where I was sir. Can, now can I go to jail. I don't want to talk. I don't want to talk. I don't know where ya'll getting to with I done [and] I'm here back in jail again." Karakostas stated that whether Davis wanted to talk was up to Davis, but that Davis probably did want to talk to the police. Davis then said he did not want to go to jail because he had not done anything wrong.

Karakostas continued probing for information about Calix's death. Karakostas asked Davis more questions about Davis's location on May 11, told Davis that he knew Davis was involved in something that happened at 31st Street and Pleasant Avenue, and implied that Davis had been identified. Davis

repeated that he wanted to go to jail for the assault.  Specifically, Davis said, "[T]ake me to jail. . . . I don't, you can cut that off, I don't have nothing to say.  'Cause I ain't done nothing.  I didn't assault nobody . . . I don't know nothing about that."  Karakostas immediately responded, "[O]kay, we're gonna end this now if that's what you want.  You just got [to] make sure that's really what you want Jerome."  Karakostas then asked Davis if he wanted to keep talking, and Davis responded, "I don't want to talk.  Take me [to jail] for this assault that you saying I did.  I done did, I didn't do no assault."

Karakostas then said, "[O]kay, alright we'll do that.  [I will] give you my card though.  If you change your mind in jail give me a call okay, 'cause chances are you're going to change your mind."  Karakostas then gave Davis his business card, closed his notebook, picked up his keys from the table, and moved toward the door.  But Davis then said, "[H]omicide unit . . . you got me in a homicide?"  Karakostas then asked Davis if he wanted to keep talking.  Davis responded by asking questions about why he was going to jail.  After Karakostas revealed more information about what the police knew about Davis's involvement in the events of May 11, Davis stated, "My rights says anything I say can and will be used against me in the court of law.  So if I tell you the truth or anything it is gonna be used against me in a court of law so I don't . . . so what's my point of talking to you?"

Davis then said, "I might as well talk to a lawyer, somebody who can help me."  After clarifying that Davis did, in fact, want to have an attorney present for questioning, Karakostas ended the interrogation and stated, "All right sit tight. If you need anything knock on the door."  Before leaving the room, Davis asked Karakostas if Karakostas would bring him a glass of water.  About 7 1/2 minutes later, Karakostas returned with a glass of water and told Davis that it "shouldn't be too much longer" before his attorney arrived.  Davis then made motions indicating Karakostas should stay in the room, and told Karakostas to close the door.

For approximately the next half hour, Davis repeatedly asked Karakostas if he could go home if he told Karakostas what he knew.  Karakostas told Davis that he would have to read Davis his *Miranda* rights again before they could talk again.  Karakostas also consistently told Davis that Karakostas could not promise Davis that Davis would be able to go home, but that if Davis was

-16-

not involved in the events on May 11, Karakostas would recommend that Davis get a bond on his assault charge. After answering Davis's questions, Karakostas reread Davis his *Miranda* rights. Davis indicated that he understood his rights and that he wanted to talk.

Davis then gave his version of the events surrounding Calix's death. Davis admitted to being present in the apartment during the shooting but denied being involved in a murder or robbery, claiming continuously that he was "in the wrong place at the wrong time." According to Davis, Dorman planned to go to Calix's apartment to purchase marijuana and asked Davis to come with him. Davis went with Dorman to Minneapolis, and when they arrived at Calix's apartment, there were "three Mexicans" in the apartment. While Dorman talked to Calix, Davis sat on a couch and watched TV with one of the men in the room. All of a sudden, Davis saw Dorman pull out a gun and Davis ran and hid in a closet with one of the other men, who was later determined to be Norman Arita.[6] Davis then heard one shot and peaked out of the closet. Dorman motioned to Davis that it was time to go, and they left the apartment. After leaving the apartment together, Davis and Dorman split up and Davis returned to his house in Saint Paul.

*Davis*, 820 N.W.2d at 531-32 (footnotes omitted).[7] The trial court, over objection, admitted into

evidence the entirety of the statement made by Davis during the interrogation.

Davis argued to both the trial court and the Minnesota Supreme Court that Davis's

waiver of his *Miranda* rights was not voluntary, knowing, or intelligent on account of

Karakostas's interrogation tactics. *See* App'x at 1444-52. Accordingly, Davis contended, the

trial court should not have admitted the statements made by Davis during the interrogation, and

---

[6]Davis insists that Cruz, not Arita, was the individual with whom he hid in the closet at the time of Calix's murder. *See* Pet. Reply No. 2 at 8 (citing App'x at 1206-11). This mistake was inconsequential to the Minnesota Supreme Court's analysis.

[7]This Court has reviewed the audio recording of Davis's interrogation, *see* ECF No. 36, and finds the Minnesota Supreme Court's summary of that interrogation to be accurate, with the exception of the mistake noted above.

his conviction and sentence should be overturned as a result of the trial court's error. The Minnesota Supreme Court "assume[d] without deciding that Officer Karakostas violated Davis's right to remain silent when Karakostas continued to question Davis after the first time Davis said: 'I don't want to talk.'" *Davis*, 820 N.W.2d at 533. It further assumed, again without deciding, that "the district court erred in admitting the statement."[8] *Id.*

Nevertheless, the Minnesota Supreme Court concluded that any error committed by the trial court was harmless beyond a reasonable doubt. That court divided Davis's statements into two portions: Statements made before Davis first invoked his right to remain silent, and statements made after Davis's first invocation. The statements made prior to the invocation, said the Minnesota Supreme Court, were admissible, as Davis had been apprised of his *Miranda* rights and had not yet invoked his right to remain silent. *Id.* at 533-34. Assuming that the statements made after the invocation were inadmissable, the Minnesota Supreme Court found that

> [t]o the extent that the inadmissible portion of Davis's statement could be said to be inculpatory in that Davis changed his story and admitted to being present during the shooting, any error was harmless because mere presence at the scene of a crime does not establish that Davis aided or abetted criminal activity. Davis's admission to being at the crime scene is also harmless because it was cumulative to other evidence linking Davis to the crime scene, including Davis's statements to Gentle and B.B.'s eyewitness identification.

---

[8]Davis states in his reply brief that the Minnesota Supreme Court "already admitted that admission of the statement was error . . . ." Reply Brief No. 3 at 2. This is incorrect; the Minnesota Supreme Court expressly declined to decide whether the trial court erred in admitting the statements into evidence. *See Davis*, 820 N.W.2d at 533.

*Id*. at 534 (citation omitted).  The Minnesota Supreme Court concluded "that any error in allowing into evidence the purportedly inadmissible portion of Davis's May 18, 2007, statement was harmless beyond a reasonable doubt" and that Davis was therefore not entitled to relief.  *Id*.

Davis argues in his habeas petition that the statements he made during this interrogation should not have been admitted for two reasons.  First, he argues that his *entire* statement should have been suppressed, as he never provided a clear waiver of his *Miranda* rights at the outset of the interrogation.  This aspect of his *Miranda* claim, however, was never presented to the Minnesota Supreme Court.  Davis's brief to the Minnesota Supreme Court focused entirely on Davis's statements made after his invocations of his right to silence and right to counsel.  *See* App'x at 1444-54.  Accordingly, the Minnesota Supreme Court did not consider whether the trial court had erred in admitting the initial potion of Davis's statement to the police (in fact, it assumed there was no such error), or whether any such error by the trial court was harmless.  Davis has failed to exhaust state-court remedies with respect to this aspect of Ground Three, and the Court recommends that this aspect of his *Miranda* claim be dismissed on that basis.  *See* 28 U.S.C. § 2254(b)(1).

Second, Davis iterates the argument that *was* presented to the Minnesota Supreme Court — specifically, that any statements made after his initial invocation of his right to remain silent should have been excluded as involuntary, and that the trial court's admission of those statements was prejudicial error.  Like the Minnesota Supreme Court, this Court will assume (without deciding) that the trial court erred in admitting any portion of the statement made by

Davis to the police after his first invocation of his right to remain silent.[9]  Nevertheless, this

Court also concludes that the Minnesota Supreme Court's finding that any error committed by

the trial court was harmless beyond a reasonable doubt was not objectively unreasonable.

Accordingly, this aspect of Ground Three should be denied on the merits.

"A federal court will not grant habeas relief unless a state court's decision 'was contrary

to, or involved an unreasonable application of, clearly established federal law' or 'was based on

an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding.'"  *Arnold v. Dormire*, 675 F.3d 1082, 1085 (8th Cir. 2012) (quoting 28 U.S.C.

§ 2254(d)(1)-(2)).  "The 'unreasonable application' clause requires the state court decision to be

more than incorrect or erroneous.  The state court's application of clearly established law must

be *objectively unreasonable*."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation omitted and

emphasis added).

The Minnesota Supreme Court provided several bases for its conclusion that any error

committed by the trial court in admitting Davis's statements from the interrogation was harmless

beyond a reasonable doubt.  First, "[o]ther than admitting that he was at the apartment, nothing

in this portion of Davis's statement linked him to the murder; indeed, if believed, Davis's

---

[9] Davis also argues that this latter portion of his statement should be excluded because he invoked his right to counsel.  *See* Petition at 8.  However, Davis did not present the claim that the latter part of his statement should be excluded because it was made after he invoked his right to counsel to the Minnesota Supreme Court, and thus, it cannot be reviewed on federal habeas.  28 U.S.C. 2254 § (b)(2).  Davis invoked his right to remain silent before invoking his right to counsel, and thus any statement that should not have been admitted due to his request for a lawyer also should not have been admitted due to his earlier invocation of his right to silence (again, assuming for the sake of argument that the statements were wrongfully admitted). Because this aspect of Ground Three is entirely subsumed by Davis's claim with respect to his invocation of his right to silence, this Court will consider only this latter aspect of Davis's *Miranda* claim.

statement exculpated him from any criminal liability relating to Calix's death." *Davis*, 820

N.W.2d at 534.  Second, "mere presence at the scene of a crime does not establish that Davis

aided or abetted criminal activity," and thus the admission solicited from Davis that he was at the

apartment at the time of the murder did not inculpate Davis as responsible in any way for Calix's

murder.  *Id.*  Third, Davis's admission was cumulative to other evidence establishing his

presence at the crime scene, "including Davis's statements to Gentle and B.B.'s eyewitness

identification." *Id.*   Fourth, Davis contends that the government used his admissions during the

interrogation to undercut the credibility of the defense narrative, as the government was able to

show that several statements Davis made to police (for example, that he and Dorman were at

Calix's apartment only so that Dorman could purchase marijuana from Calix, and that he and

Dorman split up immediately after leaving the scene) were false.  But as pointed out by the

Minnesota Supreme Court, the government just as easily could have damaged Davis's credibility

by relying only on his earlier statement during the interrogation — made before the invocation of

his right to silence, and therefore admissible — that he was not at the scene of Calix's murder *at

all*.  *Id*. at 533-34.  This statement, too, would have been undercut by substantial evidence

admitted at trial, undoubtedly damaging Davis's credibility in the process.[10]

Finally, "'[t]he admission of statements obtained in violation of *Miranda* may constitute

harmless error where there remains overwhelming independent evidence as to the defendant's

guilt.'"  *United States v. Thomas*, 664 F.3d 217, 223 (8th Cir. 2011) (quoting *Chavez v. Weber*,

---

[10]Indeed, the prosecution pointed exactly this out during its closing argument.  *See* App'x
at 1330-31.

497 F.3d 796, 805 (8th Cir. 2007)).  The Minnesota Supreme Court did not unreasonably apply

this rule in this case.  *See Davis* 820 N.W.2d at 539.

> [T]he State here produced significant evidence of guilt, including:
> inculpatory statements Davis made to Whigham both before and
> after the murder (explaining before the murder that Davis was
> about to commit a robbery and, after, that it was "all bad," that
> "some shit happened" during the robbery, and that "somebody had
> to go and it wasn't me"); lying to the police about his whereabouts
> on the night of Calix's death; B.B. identifying Davis and Dorman
> entering Calix's apartment building 3 minutes before the murder;
> B.B. testifying that Davis was holding something (that the jury
> could reasonably have inferred was a gun) on his side as he walked
> towards Calix's apartment; phone records showing several calls
> between Davis and Dorman, and Dorman and Calix on the day of
> the murder; and Gentle's testimony.

*Id*.  In short, Davis's lack of credibility — which, again, could have been established entirely

through reference to the admissible portion of the interrogation — was only one pebble on the

mountain of evidence offered by the prosecution and considered by the jury.  In these

circumstances, this Court cannot conclude that the Minnesota Supreme Court's finding that any

error committed by the trial court was harmless beyond a reasonable doubt was objectively

unreasonable.  *See Andrade*, 538 U.S. at 75.  This Court therefore recommends that Ground

Three be rejected on the merits.  As explained below, however, this Court does recommend that

a certificate of appealability be issued as to this aspect of Davis's *Miranda* claim.  *See* 28 U.S.C.

§ 2253(c)(1)(B).

### 4.  Ground Four

The trial court instructed the jury not to draw any adverse inference from the fact that

Davis did not testify at trial, despite Davis requesting such an instruction.  *See* App'x at 1303.

According to Davis, this violated his right against self-incrimination under the Fifth and

Fourteenth Amendments.  Although Davis did ask for a no-adverse-inference instruction, he did

not object to the instruction, either, and so the Minnesota Supreme Court reviewed the trial

court's decision to give the instruction for plain error.  *See Davis*, 820 N.W.2d at 537-38.  The

Minnesota Supreme Court agreed with Davis insofar as it concluded "that the district court

committed an error that was plain when it gave the instruction without Davis's consent."  *Id*.

at 537.  However, the Minnesota Supreme Court also found that "the error did not affect Davis's

substantial rights," and it rejected Davis's claim on that basis.[11]  *Id*.

     As an initial matter, it is not entirely clear that Davis adequately presented the federal

nature of this claim to the Minnesota Supreme Court.  Although Davis's counsel did cite both the

United States Constitution and a handful of United States Supreme Court opinions in his brief to

the Minnesota Supreme Court, the issue was presented overwhelmingly as an issue of state law.

*See* App'x at 1471-75.  It is therefore doubtful that Davis can be said to have exhausted state

remedies with respect to the federal aspect of this claim.  *See Palmer v. Clarke*, 408 F.3d 423,

430 (8th Cir. 2005) ("Before seeking federal habeas corpus relief, a petitioner must first fairly

present the substance of each claim to the appropriate state court, thereby alerting the state court

---

[11]Davis asserts that the Minnesota Supreme Court found that the trial court committed "plain error" when it gave the disputed instruction.  "Plain error," however, is something of a term of art under both Minnesota and federal law.  "Under the plain error test, Davis must show that (1) there was an error; (2) the error was plain; and (3) the error affected his substantial rights."  *Davis*, 820 N.W.2d at 534 (citing *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998)); *accord United States v. Long*, 721 F.3d 920, 924 (8th Cir. 2013).  The Minnesota Supreme Court found that the first two prongs of this test were met — that is, it found that the trial court had committed "an error that was plain . . . ."  *Davis*, 820 N.W.2d at 537.  But the Minnesota Supreme Court did *not* find that the trial court had committed "plain error," because it found that there was not a reasonable likelihood that the instruction had a significant effect on the verdict.  *See id*. at 538 ("Consequently, we hold that the district court did not commit plain error by giving the instruction without Davis's clear consent.").

to the federal nature of each claim."); *Boysiewick v. Schriro*, 179 F.3d 616, 621 (8th Cir. 1999)

("[R]aising a state-law claim in state court that is merely similar to the constitutional claim later

pressed in a habeas action is insufficient to preserve the latter for federal review." (quotation

omitted)).  And it was in the context of examining *state* law, not federal law, that the Minnesota

Supreme Court concluded that the trial court had erred.  *See Davis*, 820 N.W.2d at 537-38.

Accordingly, Davis has very likely failed to exhaust state remedies with respect to Ground Four.

Nevertheless, this Court will consider the merits of Davis's constitutional claim under federal

law.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on

the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State.").

Ground Four fails on the merits for two reasons.  First, although the trial court may have

erred as a matter of Minnesota law, it did not violate Davis's federal constitutional rights.  The

Supreme Court has found that giving a no-adverse-inference instruction *over objection* is not a

violation of the defendant's constitutional rights.  *See Lakeside v. Oregon*, 435 U.S. 333 (1978).

> The petitioner's argument would require indulgence in two very
> doubtful assumptions:  First, that the jurors have not noticed that
> the defendant did not testify and will not, therefore, draw adverse
> inferences on their own; second, that the jurors will totally
> disregard the instruction, and affirmatively give weight to what
> they have been told not to consider at all.  Federal constitutional
> law cannot rest on speculative assumptions so dubious as these.

*Id*. at 340.  Accordingly, giving a no-adverse-inference "instruction over the defendant's

objection does not violate the privilege against compulsory self-incrimination guaranteed by the

Fifth and Fourteenth Amendments."  *Id*. at 341.  It follows axiomatically that, if giving a no-

adverse-inference instruction *over objection* does not violate a defendant's constitutional rights,

-24-

giving such an instruction in the *absence* of an objection from the defendant must pass constitutional muster as well.

Second, even if this Court were to assume that the trial court's decision to give the no-adverse-inference instruction was contrary to clearly established federal law, "habeas relief is proper only if an error had a substantial and injurious effect or influence in determining the jury's verdict." *Edwards v. Roper*, 688 F.3d 449, 461 (8th Cir. 2012) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The Minnesota Supreme Court concluded that the trial court's decision to give the disputed instruction could not have injured Davis.

> During voir dire, Davis's counsel asked seven of the seated jurors if they understood that Davis had a right not to testify, and one of the seated jurors if he understood that Davis had a right to do nothing. Given Davis's trial strategy of highlighting his right not to testify, Davis has not proven that the district court's giving of the no-adverse-inference jury instruction prejudiced him. Rather, Davis's strategy of emphasizing his right not to testify suggests that the court's instruction was simply cumulative and did not serve to highlight Davis's decision not to testify.

*Davis*, 820 N.W.2d at 538. This Court agrees that it is extremely doubtful that Davis suffered any harm as a result of the no-adverse-inference instruction. At a minimum, the Minnesota Supreme Court's decision that Davis was not prejudiced by the no-adverse-inference instruction was not an unreasonable application of constitutional law to the facts of this case. *See* 28 U.S.C. § 2254(d)(2); *Shelton v. Purkett*, 563 F.3d 404, 408 (8th Cir. 2009) ("AEDPA mandates a deferential review of a state court decision. We may not simply conduct our own plain error review de novo." (citation omitted)). Ground Four should therefore be dismissed.

5.   Ground Five

Two witnesses told police approximately 10 minutes after the officers arrived at the scene that they "saw two black guys running away from the scene," but neither witness could confirm that the two men running away from the scene were carrying a green tub with marijuana. *Davis*, 820 N.W.2d at 535.  Neither witness was available to testify at trial.  *Id*. at 535-36.  Davis hoped to introduce these statements in order to undermine Gentle's testimony that Dorman and Davis had stolen a green tub containing 15 to 20 pounds of marijuana from Calix.  *Id*. at 535. The trial court determined that the witnesses' statements to the police were hearsay and that the statements did not fall under the excited-utterance exception or residual exception to the hearsay rule under Minnesota law.  *Id*. at 536; Minn. R. Evid. 803(2), 807.  Accordingly, the trial court prohibited Davis from introducing these statements into evidence.  Davis argues that this precluded him from putting on his defense in violation of his constitutional due-process rights. *See* Pet. Addendum at 1.

"In the habeas context, 'questions regarding admissibility of evidence are matters of state law.'" *Garcia v. Mathes*, 474 F.3d 1014, 1017 (8th Cir. 2007) (quoting *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir. 2006)).   To the extent that he argues that the Minnesota courts erred in applying Minnesota law or the Minnesota Rules of Evidence, Davis's claim is not cognizable on habeas review.  Instead, Davis must show that the trial court's decision to exclude the statements of the two witnesses as inadmissible hearsay amounted to a deprivation of his federal constitutional rights.

"'A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process.'"  *Id*. (quoting *Bucklew v.*

*Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006)).   "[A] defendant has a constitutional right to proffer exonerating statements, that would otherwise be hearsay, if they were made under circumstances providing 'considerable assurance of their reliability.'" *Skillicorn v. Luebbers*, 475 F.3d 965, 970 (8th Cir. 2007) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973)).

The Minnesota Supreme Court did not specifically evaluate whether the statements by the two witnesses "were made under circumstances providing 'considerable assurance of their reliability,'" as required by *Chambers*.  *Id*.   Instead, that court evaluated Davis's claim only under the relevant state-law standards under the Minnesota Rules of Evidence for determining whether the trial court erred in excluding the hearsay statements.  *See Davis*, 820 N.W.2d at 537. Likewise, it appears — although it is not entirely clear — that the trial court evaluated whether to exclude the statements only under the relevant state-law standards, and not the federal constitutional standard set forth in *Chambers*.  *See* App'x at 387-88.

That said, even if the Minnesota courts erred in applying the correct standard when determining whether to exclude the witnesses' hearsay statements, this Court concludes that any error was harmless beyond a reasonable doubt.  *See Middleton v. Roper*, 455 F.3d 838, 857 (8th Cir. 2006) ("Because it is unclear whether the state court reviewed [the defendant's] constitutional claim, we apply the harmless error standard of review articulated in *Chapman v. California*, 386 U.S. 18 (1967), and inquire whether the alleged error is harmless beyond a reasonable doubt.").  To begin, it is highly probable that the trial court would have excluded the statements if it had applied the *Chambers* standard.  The trial court determined that the hearsay statements did not carry "circumstantial guarantees of trustworthiness."  *Davis*, 820 N.W.2d at 537 (quotation omitted).  Several factors bolstered this conclusion:

> Neither witness volunteered to speak with police.  The statements
> were not given under oath and [the witnesses] were not subject to
> cross-examination or penalty of perjury.  Both declarants had
> motivations not to speak to the police because they did not want to
> get involved as witnesses in the case, and no other evidence
> corroborates their statements.

*Id*.  For those same reasons, it is practically certain that the trial court would have excluded the witness statements had that court considered whether the statements carried "considerable assurance of their reliability," and it is just as certain that the Minnesota Supreme Court would have affirmed the exclusion of that evidence under that standard.

Indeed, the statements offered by the two witnesses carried *none* of the indicia of reliability identified in *Chambers* as guideposts for determining whether hearsay should be admitted.  *See Chambers*, 410 U.S. at 300-01.  As explained by the Minnesota Supreme Court, the statements were elicited from police and not volunteered, and the statements were not corroborated by other evidence.  *See Davis*, 820 N.W.2d at 537.  Nor were the statements against the penal self-interest of the witnesses.  *See Chambers*, 410 U.S. at 300-01.  And neither witness was available to testify at trial.  *See Davis*, 820 N.W.2d at 535-36.  All of this suggests that the witnesses' statements would have been excluded had the specific *Chambers* criteria been considered.

Finally, again, "the State's case against Davis was strong."  *Id*. at 538.  At most, the hearsay statements Davis sought to introduce would have informed the jury that although "two black guys" were "running away from the scene" shortly after Calix was murdered, two witnesses could not confirm whether those men running away from the scene was carrying a green tub of marijuana, as Gentle had testified.  *Id*. at 535.  As just explained, this Court very much doubts that the trial court erred as a matter of constitutional law in excluding the

witnesses' statements to police.  But given the contradicting evidence of Gentle; the relatively

minor importance of the point Davis sought to make through the hearsay statements; the general

unreliability of those statements and individuals who made those statements; and the overall

strength of the prosecution's case against Davis, this Court concludes that if the trial court did err

in excluding these statements, that error was certainly harmless beyond a reasonable doubt.  *See*

*Middleton*, 455 F.3d at 857.  Accordingly, this Court recommends that Ground Five be

dismissed.

### 6.  Ground Six

Gentle testified at trial that he believed his life was at risk on account of testifying against

Davis.  Davis argues that the trial court erred by allowing Gentle to tell the jury that he was in

danger, as there was no evidence in the record that Gentle had been threatened by anyone in

connection with the case.  *See* Pet. Addendum at 2.  Davis also contends that this error violated

his Fifth, Sixth, and Fourteenth Amendment rights.

Davis (acting through his counsel) raised the issue of Gentle's testimony about

fearfulness before the Minnesota Supreme Court.  *See* App'x at 1455-60.  He did so *only* as a

matter of state law, however.  At no point did Davis ever raise the federal aspect of this claim in

the state courts.  Unsurprisingly, then, the Minnesota Supreme Court decided this issue only

under Minnesota state law and did not reach any federal constitutional questions that may have

been presented by Gentle's expression of fear.  *See Davis*, 820 N.W.2d at 534-35.  Gentle's

claim that his constitutional rights were violated by Gentle's testimony about being in mortal

danger has not been exhausted before the state courts, and Ground Six can be dismissed on that basis alone.[12]  *See* 28 U.S.C. § 2254(b)(1).

In any case, Ground Six can just as easily be dismissed on the merits.  This Court agrees, for the reasons explained by the Minnesota Supreme Court, that "[i]t is highly unlikely that Gentle's brief expression of fear had a significant effect on the verdict."  *Davis*, 820 N.W.2d at 535.

> First, Gentle did not testify that he was fearful of Davis; he described the dangers of testifying generally. . . .  Second, Gentle's fear testimony was cumulative to other evidence regarding Gentle's credibility.  For example, Gentle told the jury that he testified against Davis because "it was the right thing" to do, because he wanted "to get out of the game," and because he "felt bad about the family of the victim that got murdered over marijuana." . . .  Finally, the State only minimally relied on Gentle's expression of fear.  Questions about Gentle's fearfulness take up less than one page of the transcript, while Gentle's overall testimony spans 83 pages.  And during closing arguments, the State only briefly mentioned Gentle's fearfulness as one reason, among many, for why the jury should believe him.

--------

[12]Davis did not object to Gentle's testimony about fearfulness at trial.  Accordingly, the Minnesota Supreme Court reviewed the trial court's decision to admit that testimony only for plain error.  *See Davis*, 820 N.W.2d at 534.  Both Davis and respondent suggest that a state court's review for plain error may excuse a failure to exhaust state remedies.  *See Shelton v. Purkett*, 563 F.3d 404, 408 (8th Cir. 2009) ("Unfortunately, there exists an oft-noted, yet surprisingly persistent, split of authority in our circuit about whether plain error review 'cures' the procedural default.").  But this is true only where a state court reviews a *federal* claim for plain error.  Davis did not present any federal claim relating to Gentle's testimony about fearfulness, and the Minnesota Supreme Court did not of its own accord review any potential federal claim for plain error or under any other standard.  *See Davis*, 820 N.W.2d at 534-35.  And contrary to the parties' suggestion, the Minnesota Supreme Court's review of an alleged error of *state* law does not somehow rehabilitate Davis's failure to raise his federal claim before the state courts.  *See Sweet v. Delo*, 125 F.3d 1144, 1153 (8th Cir. 1997) (concluding that plain-error review only on state-law issues "did nothing to cure" the failure to assert a constitutional claim in state court.).

*Id.* Thus, even if the trial court committed error — constitutional or otherwise — in allowing

Gentle to testify about his fearfulness, this error could not have had a "substantial and injurious

effect or influence in determining the jury's verdict." *Edwards*, 688 F.3d at 461. Whether on the

merits or for failure to exhaust state remedies, Ground Six should be dismissed.

### 7. Ground Seven

The jury found Davis to have committed first-degree felony murder in violation of Minn.

Stat. § 609.185(a)(3). In a separate proceeding, Dorman pleaded guilty to second-degree murder

as a result of Calix's death. Davis contends that these convictions are internally inconsistent, as

"there was only *one* shot fired, from *one* gun (singular *not* plural), and Toriano Dorman admitted

to the courts and took a plea and is convicted for shooting and killing Mr. Calix." Pet. Reply

No. 4 at 1. Davis concludes that this "'logical' and 'legal' inconsistency . . . warrants federal

habeas relief." *Id.*

The prosecution went forward against Davis on the theory that he had either shot and

killed Calix, or that Davis had aided and abetted Dorman in the murder of Calix. *See* App'x

at 1316 ("Davis himself shot Mr. Calix or he aided Mr. Dorman. . . . He is either the principal or

he helped his partner."). The jury was instructed that, under Minnesota law, a defendant "is

guilty of a crime committed by another person if he has intentionally aided the other person in

committing it . . . ." App'x at 1311. By finding that Davis committed first-degree felony

murder, the jury found either that Davis himself had fired the bullet that killed Calix, or that

Davis had aided and abetted Dorman in the commission of the murder. In either case, Davis

would be guilty of § 609.185(a)(3). There is thus no inconsistency in the two convictions. Even

if Dorman admitted during his guilty plea (as Davis attests) that he pulled the trigger that

resulted in Calix's death, Davis could nevertheless be guilty of first-degree felony murder with respect to Calix if he aided and abetted Dorman during the course of a robbery.

Davis appears to believe that, by finding him guilty of first-degree felony murder, the jury necessarily found that Davis himself had pulled the trigger, as Davis had not been separately convicted of aiding and abetting murder. "But aiding and abetting is not a separate substantive offense. Rather, it is a theory of liability." *See State v. Stansberry*, No. A13-1662, 2014 WL 3799897, at *2 (Minn. Ct. App. Aug. 4, 2014) (quotations and citations omitted). The jury concluded that Davis committed first-degree felony murder; one reason it could have concluded this is because it could have found that Davis aided and abetted Dorman in causing Calix's death. There is nothing whatsoever inconsistent in finding that one defendant fired the bullet that killed a victim, while a second defendant aided the first defendant in that murder.

In any event, this claim is not cognizable on habeas review. "It is well-settled that inconsistent jury verdicts (e.g., a conviction is inconsistent with the jury's verdict of acquittal on another count or where the verdicts treat co-defendants in a joint trial inconsistently), are constitutionally permissible, and do not present a question for federal habeas review." *Oakes v. Conway*, No. 10-CV-0318(MAT), 2011 WL 3236201, at *8 (W.D.N.Y. July 28, 2011) (compiling cases). Davis has not pointed to any clearly established federal law, as determined by the Supreme Court, finding that a jury verdict that is inconsistent with another defendant's guilty plea results in a violation of the constitutional rights of the defendant who went to trial. Ground Seven is thus factually and legally infirm, and this Court recommends that the claim be dismissed.

8.   Ground Eight

Davis next claims that the prosecution violated *Brady*[13] in several respects.  *See* Pet. Addendum at 5-6.  "To show a *Brady* violation, the defendant must establish that (1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence."  *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009) (quotation omitted).

The exact scope of Davis's *Brady* claim is difficult to flesh out.  That said, Davis's claim appears to have three facets.  First, Davis contends that the prosecution failed to disclose phone records to the defense in a timely manner.  *See* Pet. Addendum at 5.  Second, Davis contends that the prosecution failed to turn over transcripts of particular interviews conducted with Gentle by law-enforcement officers.  Third, Davis appears to contend (although this is somewhat unclear) that the prosecution failed to inform the defense that certain interviews with Gentle were conducted *at all*.  This Court will discuss each facet of Davis's claim in turn.

First, Davis argues that the prosecution failed to turn over relevant phone records — that is, the raw data relating to phone calls relevant to the criminal proceedings — in a timely fashion.  There is some evidence that Davis's counsel did not receive the phone records as quickly as hoped.  *See* Pet. Ex. 30.  It is clear, however, that the defense received these phone records prior to trial.  *Id.*  "'*Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial.'"

---

[13]Davis also brings claims under *Giglio*, which provides that evidence tending to impeach the credibility of prosecution witnesses may be subject to the *Brady* disclosure requirements. *See Pederson*, 491 F.3d at 826.  This Court refers to Davis's claim under *Brady* and *Giglio* as a "*Brady*" claim simply as shorthand.

*United States v. Spencer*, 753 F.3d 746, 748 (8th Cir. 2014) (quoting *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005)).  By turning over these phone records prior to trial — albeit not as quickly as defense counsel had hoped — the prosecution satisfied its obligation under *Brady*.

Second, Davis argues that the prosecution failed to turn over transcripts of each of the interviews police conducted with Gentle during the investigation.  (Police did turn over two such transcripts, *see* Pet. Ex. 5-6, but Davis contends that there are other interviews for which no transcripts were prepared.)  However, there is no evidence that any such transcripts *exist* with respect to the specific interviews referenced by Davis;[14] the prosecution cannot suppress what does not exist in the first place.  Nor is there any indication that the information offered by Gentle in these interviews was favorable in any way to Davis.  As Davis is at pains to acknowledge elsewhere in his habeas petition, Gentle's testimony at trial proved damning to Davis's defense; it is doubtful that Gentle's statements to police were a marked reversal from his later testimony, especially since Gentle voluntarily came forward to police prior to the first of those interviews with information tying Davis to the murder.  *See* Pet. Ex. 2.  Moreover, the written summaries of the interviews of Gentle provided by the police are consistent with both the

---

[14]Davis suggests that the police were required under Minnesota law to record these interviews with Gentle.  *See State v. Scales*, 518 N.W.2d 587 (Minn. 1994).  It is not clear, however, that the requirement under Minnesota law that custodial interviews be recorded, as set forth in *Scales*, extends to the circumstances in which Gentle (a non-suspect in custody for a matter unrelated to the Calix murder) was interviewed, and thus the police may very well have concluded that recording each of these interviews was not necessary.  Moreover, to the extent that Davis argues that the government's supposed violation of *Scales* through not recording these interviews is a violation of his due-process rights, this claim is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *Buckingham v. Symmes*, No. 11-CV-2489 (PJS/SER), 2012 WL 3611893, at *1 n.2 (D. Minn. Aug. 21, 2012) ("The *Scales* recording requirement, however, is entirely a creature of state law, and there is no analogous federal requirement.").

transcripts of the interviews of Gentle that were recorded and the testimony Gentle provided at

trial.  Because Davis has failed to establish that the prosecution failed to turn over any interview

transcripts or that those transcripts (if they existed) would have proved favorable to his defense,

this facet of Davis's *Brady* claim should be denied.

Third, Davis at least suggests that the prosecution failed to disclose the written

summaries of the unrecorded Gentle interviews.[15]  *See* Pet. Addendum at 5.  But Davis's counsel

specifically referenced one of these allegedly undisclosed interviews during her cross-

examination of Gentle.  *See* App'x at 929 ("And it's correct then on — it was December 27th,

2007, that you first called the Minneapolis homicide unit?").  Obviously, then, by the date of

trial, the defense was aware that conversations between Gentle and the police had taken place

other than those for which written transcripts were provided.  Finally, even assuming that the

written summaries of the unrecorded interviews were not turned over to the prosecution (a highly

questionable assumption in light of the above), nothing about these summaries was beneficial to

Davis.  *See* Pet. Ex. 3.  Again, the summaries tended to *corroborate*, not undercut, Gentle's

testimony and the other evidence in the record.  Accordingly, Davis has failed to establish a

*Brady* violation, and Ground Eight should be denied.

### 9.  Ground Ten

---

[15]It is not entirely clear Davis is making this claim; indeed, the written summaries of the unrecorded interviews seem to be among the documents turned over during discovery to the defense.  *See* App'x at 1541-42.  At a minimum, Davis had access to these summaries (along with many documents that were undisputedly turned over to the defense) at the time of his appeal to the Minnesota Supreme Court, *see id.*, and Davis has not alleged that he came gained access to these summaries after the date of trial.

Under Minnesota law, "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  Minn. Stat. § 634.04.  Davis argues that the testimony given at trial by Gentle[16] was not corroborated, and he therefore claims that his conviction is in violation of Minnesota law.  *See* Pet. Addendum at 7.  Davis also contends that the use of uncorroborated accomplice testimony violated his constitutional due-process rights.  *Id.*

"[I]n habeas corpus proceedings, it is not within our province 'to reexamine state-court determinations on state-law questions.'" *Johnston v. Luebbers*, 288 F.3d 1048, 1056 (8th Cir. 2002) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  In reviewing a petition for a writ of habeas corpus, this Court can correct only for errors that implicate federal constitutional rights.  *See* 28 U.S.C. § 2254(a).  To the extent that Davis hopes to relitigate his argument that the trial court violated Minnesota law, then, this claim is simply not cognizable on habeas review.

Davis presented the issue of Gentle's uncorroborated testimony to the Minnesota Supreme Court entirely as a matter of Minnesota law; he did not argue that the use of uncorroborated accomplice testimony was a violation of his federal constitutional rights.  *See* App'x at 1616-21.  As such, he did not adequately present his federal constitutional claim to the Minnesota Supreme Court, and Davis has not exhausted state remedies with respect to that

---

[16]This Court assumes, for purposes of analysis, that Gentle qualifies as an accomplice under Minnesota law.  This assumption is, to say the least, questionable; at a minimum, Gentle was not convicted as an accomplice to the events surrounding Calix's death.

claim.  *See Carney v. Fabian*, 487 F.3d 1094, 1097 (8th Cir. 2007) ("[M]ere similarity between

the state law claims and the federal habeas claims is insufficient. . . ." (quotation omitted)).  This

is an entirely sufficient basis on which to deny Ground Ten.

That said, Ground Ten can also be denied on the merits.  Davis has not identified any

"clearly established Federal law, as determined by the Supreme Court of the United States"

establishing that the testimony of an accomplice must be corroborated by other evidence.  28

U.S.C. § 2254(d)(1).  Indeed, it appears that the bulk of federal case law is against Davis on this

point.  *See, e.g.*, *Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007); *Laboa v.*

*Calderon*, 224 F.3d 972, 979 (9th Cir. 2000); *Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir.

1993) ("We need not address these specific issues because state laws requiring corroboration do

not implicate constitutional concerns that can be addressed on habeas review.").  Ground Ten

can therefore be denied on the merits as well.

### 10.  Ground Eleven

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of

counsel."  *Sweeney v. United States*, 766 F.3d 857, 859 (8th Cir. 2014).  Davis alleges that his

trial counsel was ineffective in several respects during the course of the proceedings and that his

right to effective assistance of counsel was thereby violated.  To prevail on a claim of ineffective

assistance of counsel, Davis must show that his counsel's performance fell below an objective

standard of reasonableness, *see Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and

that there is a reasonable probability that, but for his counsel's errors, the result of his proceeding

would have been different, *id*. at 694.  "The first prong requires a showing that counsel made

errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the

Sixth Amendment." *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (quotations omitted). "The second prong requires a showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 753 (quotations omitted).

The Minnesota Supreme Court denied Davis's ineffective-assistance claim on direct appeal. *See Davis*, 820 N.W.2d at 539 n.10. "Because hindsight analysis is problematic, courts 'indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance.'" *Abernathy v. Hobbs*, 748 F.3d 813, 817 (8th Cir. 2014) (quoting *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005)). "Taking AEDPA and Strickland together establishes a 'doubly deferential' standard of review in § 2254 cases." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011)).

Davis alleges four specific respects in which his trial counsel was ineffective: (1) by failing to "challenge the indictment"; (2) by failing to interview and investigate a potential witness identified as "CoCo" in Davis's habeas petition; (3) by failing to suppress highly prejudicial evidence, such as Gentle's allegedly false testimony and the "green tub" identified by Gentle as used in the robbery; and (4) by failing to raise the compulsory-process challenge identified in Ground Ten of the habeas petition. Pet. Addendum at 9. The Court will consider these allegations in turn.

First, Davis does not elaborate on what his defense counsel should have specifically done to "challenge the indictment." *Id.* None of Davis's habeas claims concern any alleged deficiency in the indictment. This aspect of the ineffective-assistance claim has been insufficiently developed by Davis to merit habeas relief.

Second, Davis alleges that his defense counsel was ineffective for failing to investigate, interview, or call an individual identified as "CoCo" as a witness. But there is no reason to think that CoCo — who is also identified as "Perkins" in the record — would have offered testimony exonerating Davis. Indeed, the recorded interview police conducted with CoCo was not particularly helpful to Davis's cause; CoCo stated (among other things) that Davis had been involved in previous murders and that she had heard Davis say that a weapon he owned had been used in homicides in the past. *See* Pet. Ex. 22. CoCo also stated that she had no knowledge of Calix's murder. *Id.* In fact, Davis has presented no evidence whatsoever tending to show that CoCo would have provided testimony favorable to his defense. Under these circumstances, Davis cannot demonstrate prejudice resulting from his counsel's alleged deficiency. *See United States v. Vazquez-Garcia*, 211 Fed. App'x 544, 546 (8th Cir. 2007) ("The only information about what Morales's potential testimony would have been is speculation on the part of [the defendant]. Recognizing the deferential standard when reviewing the conduct of counsel, we decline to find prejudice in this situation when there is no evidence other than speculation to support the finding.").

Third, as explained above, Davis has not shown that any of the testimony offered by Gentle was false. Nor has Davis shown that the now-infamous green tub was improperly admitted into evidence. Davis simply assumes that, had his attorney done something differently, this crucial evidence would have been excluded from trial. There is no basis to believe this is true. At a minimum, the Minnesota Supreme Court's decision that the defense counsel's actions did not constitute ineffective assistance in this respect was not objectively unreasonable in light of the evidence presented by Davis. *See Davis*, 820 N.W.2d at 539.

Fourth, this Court has already explained that Davis's compulsory-process claim is without merit.  The Minnesota Supreme Court concluded the same.  *See Davis*, 820 N.W.2d at 539.  "[C]ounsel's failure to advance a meritless argument cannot constitute ineffective assistance."  *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994) (per curiam); *accord Correa-Gutierrez v. United States*, 455 Fed. App'x 722, 723 (8th Cir. 2012) (per curiam).  Clearly, then, Davis could not have been prejudiced by his counsel's failure to raise this non-meritorious claim.

The Minnesota Supreme Court's determination that Davis was not denied effective assistance of counsel was not an unreasonable application of federal law to the facts of this case.  Accordingly, this Court recommends that Ground Eleven of Davis's habeas petition be denied.

### 11.  Ground Twelve

In his pro se briefs to the Minnesota Supreme Court, Davis argued that the prosecutor committed countless acts of misconduct during the trial.  *See* App'x at 1515-21.  One aspect of Davis's prosecutorial-misconduct claims — that the prosecutor knowingly offered false testimony from Gentle — has already been discussed with respect to Ground Two of Davis's habeas petition.  In Ground Twelve, Davis raises another aspect of his prosecutorial-misconduct claims.  Specifically, Davis alleges that four statements made by the prosecutor during closing arguments were misstatements of the evidence in the record.  *See* Pet. Addendum at 6-7.  He further argues that his conviction must be vacated as a result of those misstatements.[17]  *Id.*  As

---

[17]In his reply brief, Davis asserts that there "are 'multiple' instances of prosecutorial misconduct . . . besides the four that the respondent spoke on . . . ."  Pet. Reply No. 4 at 6 (citing the habeas petition generally).  To the extent that Davis is referring to the prosecutorial-misconduct claim brought in Ground Two of his habeas petition, this Court has already

(continued...)

with Davis's other pro se claims of prosecutorial misconduct, the Minnesota Supreme Court

summarily found this claim to "lack merit."  *Davis*, 820 N.W.2d at 539.

As explained below, three of the four "misstatements" identified by Davis were not

misstatements of the evidence at all, and thus his claim of prosecutorial misconduct with respect

to those comments stumble out of the gate.  In the fourth comment, the prosecutor did refer to a

matter not in evidence, but any constitutional error resulting from the misstatement was

undoubtedly harmless beyond a reasonable doubt.  Accordingly, this Court recommends that

Ground Twelve be denied.

### A.  Legal Standard

"[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the

reality of the human fallibility of the participants, there can be no such thing as an error-free,

perfect trial, and . . . the Constitution does not guarantee such a trial."  *United States v. Hasting*,

461 U.S. 499, 508-09 (1983).  "The Supreme Court has divided constitutional violations that

occur during a criminal proceeding into two categories:  trial errors and structural defects."

*Sweeney*, 766 F.3d at 860.

Structural defects undermine the fairness of a criminal proceeding as a whole and require

reversal "without regard to the mistake's effect on the proceeding."  *United States v. Dominguez*

---

[17](...continued)
examined that claim and found it to be without merit.  If Davis is referring to other acts of
alleged misconduct, he not explicitly presented those acts in his habeas petition, and therefore
has neither given respondent an opportunity to respond to those allegations or this Court an
opportunity to fully examine those allegations.  Any claims of prosecutorial misconduct not
explicitly presented in Davis's habeas petition are now waived.  *Cf. Sedillo v. Hatch*, 445
Fed. App'x 95, 101 (10th Cir. 2011) ("Theories or claims not raised in a habeas petition are
ordinarily deemed waived.").

*Benitez*, 542 U.S. 74, 81 (2004). Such defects "affect[] the framework within which the trial proceeds" and not merely the trial process itself. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). For example, the "total deprivation of the right to counsel at trial" constitutes a structural defect in the criminal proceedings requiring reversal of a conviction. *Id.* at 309 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)). Because "most constitutional errors can be harmless," *Fulminante*, 499 U.S. at 306, structural defects "are the exception and not the rule," *Rose v. Clark*, 478 U.S. 570, 578 (1986).

Conversely, "[a] 'trial error' is an error that may 'be quantitatively assessed in the context of other evidence presented,' and is subject to harmless-error analysis." *Sweeney*, 766 F.3d at 860 (quoting *Fulminante*, 499 U.S. at 307-08). In the context of habeas review, the federal court's harmless-error analysis is governed by the "substantial and injurious effect" standard set forth in *Brecht. See, e.g.*, *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008) (per curiam). Prosecutorial misconduct of the kind alleged by Davis falls into the "trial error" category and is therefore governed by the *Brecht* harmless-error standard on habeas review. *See Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) ("Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the 'harmless error' test articulated in *Brecht* . . . .").

### B. Statement One

The first alleged misstatement cited by Davis relates to the prosecutor's reference to a phone call between Davis and Whigham prior to Calix's murder. During closing arguments, the prosecutor told the jury, "Remember [Davis is] talking about 'All I have left is a 63,'" a

-42-

reference to a quantity of marijuana.  App'x at 1322.  Davis argues that he never said during the
phone call in question that *he* had a "63"; instead, says Davis, he was referring to Gentle as
having the marijuana.  *See* Pet. Addendum at 10.

Both the audio recording of the phone conversation and the transcript of that recording
are less than crystal clear:

> DAVIS:  I don't even like, I don't even like doing this shit
> anymore.  I'll be ready to throw my hands up dawg I am the stick
> up man right now.  I ain't even been doing nothing dawg if I can't
> (inaudible) it ain't paying off for me.
>
> WHIGHAM:  (inaudible) selling (inaudible) selling Blazers and
> whatever.
>
> DAVIS:  Hell no.
>
> WHIGHAM:  Huh?
>
> DAVIS:  Hell no.
>
> WHIGHAM:  You ain't doing nothing?[18]
>
> DAVIS:  Hell no (inaudible) working with a 63 and falling off and
> working it up it ain't no more than that.

App'x at 1032.  In context, it appears that Davis begins by discussing his own financial affairs,
and that the conversation segues into a discussion of what Gentle was currently doing for money.
Either Davis or Gentle — it is not altogether clear who from the transcript — was "working with
a 63 and falling off and working it up" — that is, selling the marijuana.  Given the preceding

---

[18]This may be a mistake in the transcription; Whigham may have asked "Jigg ain't doing
nothing?" at this point in the conversation, with "Jigg" referring to Gentle.  *See* ECF No. 37
(audio recording of phone call).

moments of the conversation, the prosecutor's statement that Davis was the person working with the marijuana was a reasonable inference.

Indeed, there is reason to think that even if Davis *were* referring to Gentle as the person "working with a 63" in the conversation, he was doing so in reference to Gentle selling the marijuana on Davis's behalf. Gentle testified at trial that Davis would give him marijuana to sell, *see* App'x at 914, and this portion of the conversation began with a discussion of what Davis was doing to make money. *See also id.* at 1041-42 (testimony from police officer about the statement at issue). In that respect, it does not matter whether Davis was referring specifically to himself or to Gentle selling the "63"; in either event, the marijuana would have been his own. In either case, the Court cannot conclude that this admittedly loose paraphrasing of the phone conversation was a misstatement of the evidence by the prosecutor.

Moreover, even if the prosecutor's comment did constitute a misstatement of the evidence, that error was surely harmless. Even if Davis is correct that the allusion to a "63" in the phone conversation was an entirely unrelated aside to Whigham about Gentle's affairs that had no relevance whatsoever to the immediately preceding conversation about Davis's financial situation, it is unimaginable that this misstatement by the prosecutor had a "substantial and injurious effect" on the verdict. The prosecutor's paraphrase of Davis — "All I have left is a 63" — was placed in the appropriate context of discussing the evidence relating to Davis's motive for robbing Calix. App'x at 1322. In addition, the prosecutor accurately recounted several other aspects of the same conversation establishing Davis's motive (including his discussion about his finances) and his preparation for the robbery. *Id.* at 1321-22.

In short, the prosecutor's comment was not a misstatement of the evidence, and even if it were, the misstatement did not have a substantial and injurious effect on Davis. Accordingly, Minnesota Supreme Court's decision that this aspect of Davis's prosecutorial-misconduct claim lacked merit was not objectively unreasonable. This aspect of Ground Twelve should therefore be dismissed.

### C.  Statement Two

The second alleged misstatement cited by Davis was a reference to a May 18, 2007 phone call between Whigham and Davis. *See* Pet. Addendum at 10-11. Davis contends that there was no phone call on May 18 between he and Whigham. *Id*. The transcript from the phone call at issue does state that the call was made on May 13, not May 18. *See* App'x at 1036. The prosecution, however, elicited testimony from a police officer in which the officer stated that the correct date of the phone call was May 18. *See* App'x at 1042. Moreover, the prosecutor explained this discrepancy during closing argument. *See id*. at 1323 ("By the way, on the transcript it said May 13th, but you heard Sargeant Porras say actually that was a typo. It was May 18th."). Given the testimony from the police officer as to the correct date of the phone call, the prosecution did not misstate the evidence in the record when it stated that the call occurred on May 18.[19] Accordingly, this aspect of Ground Twelve is entirely without merit.

### D.  Statement Three

---

[19]Even if the statement by the prosecutor (and the testimony of the police officer) were incorrect, absolutely nothing turned on the question of whether the phone call was placed on May 13 or May 18. Moreover, the substance of the phone call at issue was accurately conveyed by the prosecutor during closing arguments. *See* App'x at 1322-23. Davis could not possibly have suffered any prejudice from the alleged misstatement of the date of the phone call.

After Calix's death, Davis traveled to Gentle's house and informed him about the incident.  Over the next few hours, Davis performed several errands related to the murder and robbery, including disposing of the murder weapon and purchasing baggies for distributing the marijuana stolen from Calix.  *See* App'x at 906-14.  Gentle followed behind Davis in his own car as Davis performed these tasks.  *Id*.  Gentle testified that he took his own car rather than riding with Davis because he was wanted by federal agents at that time and was worried about being in a car with Davis.  *See id*. at 906.  Gentle also testified that Davis wanted him to follow behind Davis's car to prevent anyone from following Davis as he performed the errands.  *Id*. at 907.

During closing argument, the prosecutor alluded to one reason why Gentle believed he was more likely to be pulled over if riding with Davis as opposed to in his own car — Davis's new car was carrying a temporary sticker.  *Id*. at 1326.  This fact was not in evidence, however; neither Gentle nor anyone else ever testified that Davis's car had a temporary sticker.  Respondent concedes that the prosecutor erred by referring to the temporary sticker, but argues that any error was harmless.  *See* Memo in Opp. at 29 [ECF No. 31].

This Court agrees.  The argument that this misstatement may have had any effect on the jury's verdict — much less a substantial and injurious effect — is facially absurd.  Nothing about Davis's guilt or innocence depended on whether his car was carrying a temporary sticker.  The only relevance of the sticker was as to Gentle's decision to follow behind Davis in his own car, rather than ride in Davis's car, during the hours after the murder.  This was an exceedingly minor point, and it was otherwise established through Gentle's testimony about his motives for driving behind Davis in the hours after the murder.  *See* App'x at 906-07.  The trial court also explained to the jury during final instructions that "[i]f the attorneys or I have made or should make any

statements as to what the evidence is which differs from your recollection of the evidence, you should disregard the statements and rely solely on your memory." *Id*. at 1304.

Davis has failed to show that the prosecutor's trivial error was harmful in any way. The Minnesota Supreme Court's decision that this aspect of his prosecutorial-misconduct claim lacked merit was not objectively unreasonable, and thus this aspect of Ground Twelve should be dismissed.

### E.  Statement Four

Finally, Davis argues that the prosecutor misstated the evidence when he stated during closing arguments that Gentle "came to court getting nothing, no promises, no reward, no leniency, not from us, not from the feds." App'x at 1329. This was an entirely accurate statement. Gentle did receive some minor consideration for his early conversations with police about the Calix murder in an unrelated federal criminal matter. This consideration was referenced in the prosecutor's closing arguments, *see id*. at 1327, and was thoroughly explored during the defense's cross-examination of Gentle, *see id*. at 929-34. But there is no evidence in the record that Gentle received any *additional* consideration for testifying at trial — that is, for "[coming] to court." *Id*. at 1329. The prosecutor did not misstate the evidentiary record in that respect, and Davis's claim of prosecutorial-misconduct therefore fails.

As explained above, three of the four comments by the prosecutor were not misstatements, while the fourth was unquestionably non-prejudicial. This Court thus recommends that Ground Twelve be dismissed.

### 12.  Ground Thirteen

Davis next alleges that the prosecution struck a prospective juror from the jury panel during voir dire on account of his race or age, in violation of *Batson*. "Ordinarily, a claim that peremptory challenges have been exercised in a discriminatory manner is procedurally defaulted if there has been no timely objection." *Carter v. Hopkins*, 151 F.3d 872, 875 n.8 (8th Cir. 1998) (compiling cases). "Timely" in this context means "before the venire is dismissed and before the trial commences." *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994); *accord United States v. Brown*, 634 F.3d 435, 440 (8th Cir. 2011). Davis did not object to the prospective juror's dismissal,[20] and thus any *Batson* claim with respect to that juror's dismissal was procedurally defaulted at that time the trial commenced. Ground Thirteen must be dismissed on that basis.

### 13.  Ground Fifteen

Finally, Davis argues that each of the other allegations of error, taken together, combine to constitute cumulative error sufficient to warrant habeas relief. But "'cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.'" *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997) (quoting *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990)). As explained at length above, none of Davis's claims, taken alone, entitles him to habeas relief. Those individual claims are no more availing when repackaged into a single claim of cumulative error. Ground Fifteen should therefore be dismissed.

### C.  Evidentiary Hearing

---

[20]This Court also notes that the record does not reflect that the prosecution used a peremptory challenge on the prospective juror at issue. *See* App'x at 621.

Davis, in passing, requests an evidentiary hearing "to clear the facts of the case up."  Pet.

Reply No. 2 at 8.  Under 28 U.S.C. § 2254(e)(2),

> [i]f the applicant has failed to develop the factual basis of a claim
> in State court proceedings, the court shall not hold an evidentiary
> hearing on the claim unless the applicant shows that —
>
> (A) the claim relies on —
>
>> (i) a new rule of constitutional law, made
>> retroactive to cases on collateral review by the
>> Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been
>> previously discovered through the exercise of due
>> diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish
> by clear and convincing evidence that but for constitutional error,
> no reasonable factfinder would have found the applicant guilty of
> the underlying offense.

"AEDPA dictates that an evidentiary hearing may only be held in extremely limited

circumstances when the factual basis for a claim was not developed in state court."  *Cole v.*

*Roper*, 623 F.3d 1183, 1192 (8th Cir. 2010).  Davis has not attempted to show how he has

satisfied this standard, and any request for an evidentiary hearing is almost certainly barred by

§ 2254(e).

In any event, most of Davis's claims turn on strictly legal determinations; for example,

no set of facts will show that his claim of cumulative errors is cognizable on habeas review, or

that he actually exhausted his unexhausted habeas claims.  For many other claims, the relevant

facts are undisputed, and Davis has not indicated what he would hope to uncover through an

evidentiary hearing; for example, respondent does not dispute that Dorman pleaded guilty to

murdering Calix, or that he did not make a *Batson* objection.  And even where there are disputes

as to the relevant facts (such as what Cruz and Arita would have said at trial), Davis has not demonstrated any likelihood that the jury would have found him not guilty if the state of the world was what he claims it to be; for example, even if Davis could show that Cruz and Arita would have corroborated his defense (and there is no reason to think they would), it is still unlikely that the jury would have found Davis not guilty in light of the substantial evidence weighing in the other direction.  Davis's request for an evidentiary hearing should therefore be denied.

### D.  Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a certificate of appealability ("COA").  *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Davis has raised a great number of issues in his habeas petition.  However, this Court does not believe that any court, including the Eighth Circuit Court of Appeals, would decide Davis's claims any differently than this Court has recommended.  The only possible exception is whether the Minnesota Supreme Court's finding was objectively unreasonable when it determined that any error committed by the trial court in admitting Davis's statements from his interrogation to be harmless beyond a reasonable doubt.  Accordingly, this Court recommends that a certificate of appealability be granted on that single question.

-50-

RECOMMENDATION

Based upon the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY RECOMMENDED THAT:

1.      The petition for a writ of habeas corpus of petitioner Jerome Emmanuel Davis

        (Doc. No. 1) be DENIED.

2.      This action be DISMISSED WITH PREJUDICE.

3.      No evidentiary hearing be conducted.

4.      A certificate of appealability be granted only as to the following question:  Was

        the Minnesota Supreme Court's finding objectively unreasonable that any error in

        admitting Davis's statements from interrogation after his invocation of his right to

        silence was harmless beyond a reasonable doubt?


Dated: November  19 , 2014                   __s/*Jeffrey J. Keyes*_____
                                             Jeffrey J. Keyes
                                             United States Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by December 3, 2014, a writing which
specifically identifies those portions of this Report to which objections are made and the basis of
those objections.  Failure to comply with this procedure may operate as a forfeiture of the
objecting party's right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within fourteen days after service thereof.  All briefs filed under this rule
shall be limited to 3500 words.  A district judge shall make a de novo determination of those
portions of the Report to which objection is made.  This Report and Recommendation does not
constitute an order or judgment of the District Court, and it is therefore not appealable directly to
the Eighth Circuit Court of Appeals.